

Filed/Docketed
Feb 16, 2021

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OKLAHOMA

IN RE:                                )
                                      )        **Case No. 19-12014-R**
KRAMER, Robert Brett,                 )        **Chapter 7**
                                      )
                        Debtor.       )

## ORDER REGARDING
## TRUSTEE'S NOTICE TO SELL PERSONAL PROPERTY

Before the Court is the Trustee's Notice to Sell Personal Property ("Sale Notice") (Doc. 79) wherein the Chapter 7 Trustee ("Trustee") has given notice of his intent to sell the Debtor's interests in the following entities: (1) 2006 Pinnacle Holdings LLC ("Pinnacle"); (2) Native American Fund Advisors LLC ("NAFA"); (3) PJ Oil LLC ("PJ Oil"); (4) Plouton Petrol LLC ("Plouton"); (5) Ivy Energy 2006 LP ("Ivy"); and (6) Caddo Lake Drilling Partnership ("Caddo Lake"). Trustee intends to sell the interests to Trak-1 Technologies LLC ("Trak") for the following amounts: Pinnacle - $5,000; NAFA - $5,000; PJ Oil - $1,000; Plouton - $1,000; Ivy - $1,000; and Caddo - $1,000. If a competitive bid is filed, Trustee intends to sell the interests at auction to the highest bidder.

Debtor Robert Brett Kramer ("Kramer"), individually and in his capacity as member and manager of Pinnacle, NAFA, PJ Oil, and Plouton, filed an objection to Trustee's proposed sale of interests in four of the six entities, namely Pinnacle, NAFA, PJ Oil, and Plouton (the four entities sometimes collectively referred to as the "LLCs") (Doc. 84). Trustee filed a response to Kramer's objection (Doc. 88), and Kramer filed a reply (Doc. 95). Two members of PJ Oil, namely Kimberly McClung and Matt Kramer ("PJ Oil Members"), objected to Trustee's proposed sale of Kramer's interest in PJ Oil (Doc. 87). Trustee responded (Doc. 90) and the PJ Oil Members replied (Doc. 92). Four members of

Plouton, namely Natalie L. Strimple, Zachary K. Kramer, Hannah L. DeSpain, and Matthew B. Kramer ("Plouton Members"), objected to the proposed sale of Kramer's interest in Plouton (Doc. 86). Again, Trustee responded (Doc. 89), and the Plouton Members replied (Doc. 91). No objections have been filed in connection with Trustee's intent to sell Kramer's interests in Ivy and Caddo Lake.

On December 15, 2020, the Court held a telephonic evidentiary hearing on these contested matters. Patrick J. Malloy III appeared on behalf of Trustee and the estate; Kramer appeared personally and through his counsel, Sam G. Bratton II; the Plouton Members and PJ Oil Members appeared through their counsel, Dallas L.D. Strimple; and Trak appeared through its counsel, Sidney K. Swinson.  Three witnesses, i.e., Trustee, Kramer, and David Poarch (a member and manager of Pinnacle and NAFA), testified in person.  The PJ Oil Members, the Plouton Members, five members of Pinnacle, and four members of NAFA submitted written testimony.[1]

Upon full consideration of the testimony and documentary evidence admitted at the hearing, the arguments of counsel, the record in this Chapter 7 case, and applicable law, the Court finds and concludes as follows:

---

[1]    See Joint Stipulation of Fact Regarding Objections of Plouton Objectors and PJ Oil Objectors (Doc. 98) and Stipulation (Doc. 99).  Trustee and Trak waived any hearsay objections to the written testimony, but reserved their objection to the relevance of such testimony.  The Court finds the testimony relevant, and thus overrules Trustee's and Trak's objections.

## I.      Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1334, §§ 157(a), (b)(1), and (b)(2)(A), (N), and (O), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.     Background

Trustee filed the Sale Notice on October 6, 2020.  The Sale Notice provided that Trustee intended to sell Kramer's interests in the six entities to Trak[2] on November 12, 2020, for a total amount of $14,000 unless an objection or competitive bid was timely filed, and that further notice of a hearing or a private auction would be given in the event an objection or competitive bid was filed.  Trustee mailed the Sale Notice to all creditors on the matrix and to all known members of each of the six entities (Doc. 80).[3]

---

[2]     Trak holds a state court judgment against Kramer in the amount of $367,661.20 (exclusive of interest) which was entered in 2019 after almost a decade of acrimonious litigation. See Claim No. 3. An appeal of the judgment is pending before the Oklahoma Supreme Court.

[3]     The sale described in the Sale Notice is not Trustee's first attempt to sell these entities. On August 4, 2020, Trustee filed a notice proposing to sell interests in the same six entities to Trak for $15,000 ("August 4th Notice"). Doc. 71. Kramer objected to the August 4th Notice, citing, among other things, that the other members of the entities were not given notice of the proposed sale or an opportunity to exercise their rights under the respective Operating Agreements. Doc. 73. In September 2020, Trustee moved to withdraw the August 4th Notice. Doc. 75. In his motion to withdraw, Trustee stated that he was proposing to sell only "Debtor's non-economic interests" in the six entities (although the August 4th Notice did not so state), and that he had negotiated a sale of the same "non-economic interests" to Kramer for the same price, i.e., $15,000. Doc. 75, ¶¶ 1, 3. Kramer's offer to buy the interests included a representation that he would obtain all consents and approvals required under the Operating Agreements to accomplish the sale.  Doc. 84 at 4. As justification for selling the interests to Kramer instead of Trak, Trustee stated that such sale "avoids the time and expense of litigating the matters raised by [Kramer's] objection." Doc. 75, ¶ 4. The Court granted Trustee's withdrawal motion and the August 4th Notice was withdrawn.

Objections were timely filed, and the proposed sale to Trak did not close on November 12, 2020. The objecting members and managers of the LLCs contend that the Sale Notice is deficient in that it fails to comply with the transfer procedures and restrictions dictated by the applicable Operating Agreement. The Operating Agreements generally prohibit the sale of a member's interest to a non-affiliated third party without the consent of the other members. Some of the Operating Agreements provide the LLC and/or members with rights of first refusal. Accordingly, the objecting parties ask the Court to deny approval of a sale of Kramer's interests in the LLCs to Trak, and to condition any sale of those interests on compliance with the transfer provisions of the respective Operating Agreements.

Trustee argues that he intends to sell only the "economic interest" in each of the LLCs, a term Trustee does not define but arguably is limited to Kramer's interest in future distributions. Trustee acknowledges that the Sale Notice "fails to disclose that the Trustee only intends to sell the Debtor's economic interests in the referenced LLCs—not the full

---

Trustee never filed a notice proposing a sale to Kramer, however. Instead, Trustee filed the Sale Notice at issue herein, again seeking to sell Kramer's interest in the same six entities to Trak for a total of $14,000, an amount less than Trak's original offer and less than Kramer's subsequent offer. Doc. 79 at 2. When Kramer pointed this out in his objection to the Sale Notice, Trustee explained that he "inadvertently failed to specify another entity that the Trustee had intended to disclose [as part of the sale to Trak] – Ivy Energy LP (Ivy Energy) — $1,000." Doc. 88, ¶ 2. Although Trustee contends that the addition of Ivy Energy renders Trak's current offer equal to Kramer's former offer, the fact remains that Kramer's $15,000 offer included only the six entities at issue here, not the six entities plus Ivy Energy that Trustee intends to sell to Trak for $15,000.

In light of the Court's decision on the merits, however, the discrepancy is not material, but the procedural history is relevant to show that Kramer's offer to purchase the estate's interest in all the LLCs apparently remains outstanding.

membership interests."[4] With that clarification, Trustee contends that none of the Operating Agreements restrict the sale or assignment of the economic component of a membership interest, so he is not required to abide by the procedures and restrictions in selling such interests to Trak.  In the alternative, Trustee argues that even if the Operating Agreement provisions could be construed to prohibit or condition the transfer of economic interests, those provisions are unenforceable under the Oklahoma Limited Liability Company Act.[5]

Because the LLCs are made up of different sets of members and managers, and each Operating Agreement contains unique transfer provisions, the Court will consider the objections with respect to each LLC in turn.[6]

## III.   Pinnacle

### A.   Findings of Fact

Pinnacle was created in 2005 to consolidate the management of two investment entities formed in 1996.  Pinnacle has twelve members. On the petition date, Kramer owned 23% of Pinnacle. Kramer and Mr. Poarch are Pinnacle's managers. Kramer also serves as Pinnacle's Chief Investment Advisor and its tax partner. As Chief Investment Advisor, Kramer cultivates relationships with high net-worth individuals and entities, and manages their investment portfolios. Kramer's relationships, knowledge, experience, and

---

[4]     Doc. 88, ¶ 3.

[5]     18 O.S. §§ 2000, *et seq*.

[6]     The LLCs are limited liability companies formed under the Oklahoma Limited Liability Company Act.  Each Operating Agreement provides that it shall be construed and interpreted according to Oklahoma law.

performance as Chief Investment Manager are crucial to the continuing viability of Pinnacle and to the value of its members' interests.

Kramer testified if Trustee transferred his financial interest in Pinnacle to Trak, his incentive for providing services and generating revenue for Pinnacle would disappear, as he has no interest in working for nothing while enriching Trak. Kramer is not bound by any agreement with Pinnacle that would preclude him from opening or joining a competing investment firm. Mr. Poarch testified that losing Kramer would have a "severe negative impact" on revenue and on the value of the business. Kramer also expressed a concern that his clients' privacy would be compromised if Trak gained rights to the revenue he generates from providing investment services to those clients. In their written testimony, five members of Pinnacle objected to the sale of Kramer's economic interest to Trak.[7]

Relevant to this dispute, the Pinnacle Operating Agreement contains the following provisions:

ARTICLE X
Transfer of Units

Section 10.01. Transfer

A.      The term "transfer," when used in this Article X with respect to a Unit,[8] shall be deemed to refer to *a transaction by which the Member assigns all or a portion of his Units, or any interest therein*, *to another Person*,[9] or by which the holder of a Unit assigns the Unit to another Person or Assignee,[10] and includes a sale, assignment, gift, pledge, encumbrance,

---

[7]      Stipulation, Doc. 99.

[8]      "'Unit' means a Unit representing an interest in the Company[.]" Pinnacle Operating Agreement, Debtor's Exhibit 1, at 10.

[9]      "'Person' means a natural person, partnership, domestic or foreign limited partnership, domestic or foreign limited liability company, trust, estate, association or corporation." Id. at 9.

[10]      "'Assignee' means a Person to whom one or more Units have been transferred, by transfer or assignment or otherwise, in a manner permitted under this

hypothecation, mortgage, transfer by will or intestate succession, exchange or any other disposition.

B.     *No Units shall be transferred, in whole or in part, except in accordance with the terms and condition[s] set forth in this Article X.*  Any transfer or purported transfer of any Units not made in accordance with this Article X shall be null and void. . . .

Section 10.02.  Transfer of Units by a Member.

A.     Except for transfers to a Permitted Transferee,[11] *no Units may be transferred by a Member* unless the following conditions are first satisfied:

1.  *The Preferential Offer pursuant to Section 10.03 has been made and concluded*; and

2.  The transferee and each Member execute and file all documents necessary for the transferee to be a Substitute Member[12] and be bound by the terms hereof and such transferee is admitted as a Substitute Member.

\*\*\*\*\*

Section 10.03.  Preferential Offer.

A.     *In the event a Member desires to sell all or any portion of his membership interest in the Company ("Transaction Offer") to a third party purchaser ("Proposed Purchaser") other than a Permitted Transferee*, the Selling Member shall obtain from such third party a bona fide written offer to purchase such interest in the Company, stating the terms and conditions upon which the purchase is to be made and the consideration therefor.  The Selling Member shall give written notification to the remaining Members, by certified mail or personal delivery, of his intention to so transfer such membership interest in the Company, furnishing to the remaining Members a copy [of the written offer].

---

Agreement, and who has agreed to be bound by the terms of this Agreement but who has not become a Substitute Member."  Id. at 6.

[11]     "'Permitted Transferee' means (1) each existing Member who is a party to this Agreement or; (2) a descendant or spouse of a Member, . . . or; (3) a trust created for the primary benefit of anyone in (1) or (2) above; or (4) a corporation or other legal entity in which the transferor or Member owns all the equity and has full voting control."  Id. at 9.

[12]     "'Substitute Member' means a transferee of a Unit who is admitted as a Member to the Company pursuant to Section 11.01 in place of and with all the rights of a Member."  Id.

B.     *The remaining Members, and each of them shall, [on a pro rata basis], have the right to exercise a right of first refusal to purchase all, but not fewer than all, the Units proposed to be sold by the Selling Member on the same terms and conditions as stated in the aforesaid written offer to purchase.* . . . [The remainder of subsection B sets forth procedures and timelines for exercising rights of first refusal].

C.     In the event of the purchase of the Selling Member's Units in the Company by a third party purchaser, and as a condition to recognizing the effectiveness and binding nature of any such sale and substitution of a new Member as against the Company or otherwise, the remaining Members may require the Selling Member and the proposed purchaser, transferee, assignee, or Substitute Member to execute, acknowledge and deliver to the remaining Members . . . documents, and perform all such other acts which the remaining Members may deem necessary or desirable. . . .

*****

E.     If Units are transferred to a third party, said third party may be admitted as a Substitute Member only in accordance with Article XI.[13]

Trustee proposes to sell the economic component of Kramer's membership interest in Pinnacle (*i.e.*, the right to receive 23% of Pinnacle's distributions) to Trak for $5,000, or, if a competitive bid is submitted and an auction is held, to the highest bidder.

B.     <u>Conclusions of Law</u>

*1.     Restrictive Covenants in the Pinnacle Operating Agreement*

First, it is important to note that Trustee acknowledges, as he must, that Trustee's proposed transfer is subject to all *enforceable* terms of the Operating Agreement.[14] The

---

[13]     Pinnacle Operating Agreement at 20-23 (emphasis added).

[14]     No one contends that the transfer restrictions in Article X of the Pinnacle Operating Agreement are so-called *ipso facto* clauses that are rendered unenforceable by 11 U.S.C. §§ 541(c) and/or 363(l).   Article X's restrictive covenants are not conditioned on a member's insolvency or triggered by the commencement of a bankruptcy case, so §§ 541(c) and 363*(l)* are clearly inapplicable. Trustee claims, however, that the Oklahoma Limited Liability Company Act renders unenforceable any operating agreement provision that restricts the sale of bare economic interest in a limited liability company.  The Court addresses this argument later in this opinion.

Pinnacle Operating Agreement is a private agreement among its members. Trustee's desire and obligation to maximize the return on estate assets cannot alter or supplant the rights conferred upon Pinnacle's members in the Operating Agreement. The Tenth Circuit has held:

> One of the central precepts of bankruptcy law is that

>> a bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition. Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest. Further, a trustee takes the property subject to the same restrictions that existed at the commencement of the case. *To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate.*

> In re Sanders, 969 F.2d 591, 593 (7th Cir.1992) (citations and quotations omitted); see also COLLIER ON BANKRUPTCY ¶ 541.01 at 541–8.3 (15th ed. rev.2009) ("Subdivision (d) of [§ 541] makes clear that the estate can only succeed to the same property interest that the debtor possesses, and cannot achieve a greater interest.").[15]

---

[15]     In re Graves, 609 F.3d 1153, 1156 (10th Cir. 2010) (emphasis added).  See also Sheehan v. Warner (In re Warner), 480 B.R. 641, 656-57 (Bankr. N.D. W.Va. 2012) ("The estate succeeds to no more interest than the debtor had, and the estate takes its interest subject to the conditions under which the debtor held the interest." (internal quotes and citations omitted)); In re Capital Acquisitions & Management Corp., 341 B.R. 632, 638 (Bankr. N.D. Ill. 2006) (Trustee "took [Debtor's] property rights as it found them on the date of the petition. [Debtor's] interest in [the LLC] is subject to this right of first refusal, and that is how the [Trustee] must sell it"); Rice v. Shoney's Inc. (In re Dean), 174 B.R. 787, 791 (Bankr. E.D. Ark. 1994) ("trustee succeeds to all of the rights of the debtor, including restrictions on transfers and options of others to purchase").  See also 3 COLLIER ON BANKRUPTCY ¶ 363.10[1] ("[A] restrictive covenant limiting who may own property will not prevent the property from entering the estate, and indeed from being used by the trustee, but it would effectively limit the trustee's ability to sell the property to an entity other than one qualified under the restrictive covenant.  General transfer restrictions, to the extent enforceable under applicable nonbankruptcy law, such as a limitation on the identity or affiliation of a buyer or a right of first refusal, are enforceable.").

    See also Pinnacle Operating Agreement § 10.02(E) ("Any holder of a Unit (including a transferee thereof) shall be deemed conclusively to have agreed to comply with and be bound by all terms and conditions of this Agreement, with the same effect as

Kramer contends that Trustee cannot sell the estate's economic interest in Pinnacle to Trak (or to any other unaffiliated third party) without following the procedures contained in Article X of the Operating Agreement, particularly Section 10.03 thereof which affords Pinnacle's other members rights to acquire the interest under the same terms offered by Trak. Trustee counters that Pinnacle's members' rights of first refusal are not triggered unless a member proposes to sell "all or any portion of his **membership interest**"[16] to a third party.  Trustee contends that the carved-out economic interest is not a "membership interest."

Resolution of this dispute calls for construction and interpretation of a contract. The Pinnacle Operating Agreement provides that it "shall be construed in accordance with and governed by the laws of the State of Oklahoma."[17]

Under Oklahoma law,

[a] contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context. The language in a contract is given its plain and ordinary meaning unless some technical term is used in a manner meant to convey a specific technical concept. The court must interpret a contract so as to give effect to the intent of the parties at the time the contract was formed.[18]

---

if such holder had executed an express acknowledgment thereof, whether or not such holder has executed an express acknowledgment thereof."); 18 O.S. § 2012.2(B) ("A member or manager of a limited liability company or an assignee of a capital interest is bound by the operating agreement regardless of whether the member, manager or assignee executes the operating agreement").

[16]     Doc. 88 at 3 (Trustee's emphasis).

[17]     Pinnacle Operating Agreement § 15.09.

[18]     Mercury Inv. Co. v. F.W. Woolworth Co., 1985 OK 38, 706 P.2d 523, 529 (footnotes and citations omitted).

Upon review of the Pinnacle Operating Agreement, and considering it as a whole to give effect to all its provisions and to the intention of the parties, the Court concludes that Trustee's proposed sale and transfer of the economic benefits of the estate's membership interest is subject to all procedures and restrictions set forth in Article X.

Article X governs the transfer of "Units" in Pinnacle.  In general, a "Unit" represents "an interest in the Company[.]"[19]  Section 10.01(A) expands the definition of "Unit" for the purposes of Article X.  It provides that "[t]he term 'transfer,' when used in this Article X with *respect to a Unit*, shall be deemed to refer to a *transaction by which the Member assigns all or a portion of his Units, or any interest therein, to another Person*."[20]  Trustee's proposed sale of Kramer's 23% interest in Pinnacle's distributions falls within the plain meaning "any interest therein" of the estate's "Units."

For the purposes of Article X, a "transfer" includes "a sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, transfer by will or intestate succession, exchange or any other disposition."[21]  Accordingly, *any* transaction in which a member purports to convey *any* interest in *any* Unit to *any* other person or entity is a "transfer" governed by Article X.

Section 10.01 further provides that "[n]o Units shall be transferred, in whole *or in part*, except in accordance with the terms and condition[s] set forth in this Article X."[22]

---

[19]   Pinnacle Operating Agreement at 10.

[20]   Id.§ 10.01(A) (emphasis added).

[21]   Id.

[22]   Id. §10.01(B).

This admonition also recognizes that an effort to transfer "parts" of Units is subject to the restrictions of Article X.

Next, Section 10.02 provides, in part—

> Except for transfers to a Permitted Transferee [*i.e.*, a member's trust, wholly owned entity, or close family member], no Units may be transferred by a Member unless the following conditions are first satisfied:
>
> > 1. The Preferential Offer pursuant to Section 10.03 has been made and concluded[.][23]

By executing the Pinnacle Operating Agreement, Pinnacle's members (including Kramer, whose metaphorical shoes Trustee now wears) agreed that no member may transfer any Unit (which, under Section 10.01(A), includes any interest in a Unit) to a non-affiliated third party without complying with the Preferential Offer requirements.

In Section 10.03, entitled "Preferential Offer," Pinnacle members agreed that a member seeking to sell any portion of his interest to an unaffiliated third party must extend to all other members the opportunity to exercise rights of first refusal. It states—

> In the event a Member desires to sell *all or any portion of his membership interest* in the Company ("Transaction Offer") to a third party purchaser ("Proposed Purchaser") other than a Permitted Transferee, the Selling Member shall obtain from such third party a bona fide written offer to purchase such interest in the Company, stating the terms and conditions upon which the purchase is to be made and the consideration therefor . . .
>
> The remaining Members, and each of them shall, [on a pro rata basis], have the right to exercise a right of first refusal to purchase all, but not fewer than all, the Units proposed to be sold by the Selling Member on the same terms and conditions as stated in the aforesaid written offer to purchase[.][24]

---

[23]     Id. § 10.02.

[24]     Id. § 10.03(A) and (B) (emphasis added).

Trustee argues that the economic interest he proposes to sell is not a "membership interest" and therefore he is not required to comply with Section 10.03.  The Pinnacle Operating Agreement does not define "membership interest," but the Oklahoma Limited Liability Company Act does.  According to the Act, a "membership interest" is--

> a member's rights in the limited liability company, collectively, including the member's share of the profits and losses of the limited liability company, the right to receive distributions of the limited liability company's assets, and capital interest, any right to vote or participate in management, and such other rights accorded to members under the articles of organization, operating agreement, or the Oklahoma Limited Liability Company Act.[25]

Section 10.03's preferential offer requirement is not limited to sales of the entire collection of a member's rights defined above, however.  Section 10.03 expressly states that its provisions apply to the sale of "any portion" of the seller's "membership interest."[26] Trustee has apportioned Kramer's membership interest into economic interests and non-economic interests, and intends to sell the economic "portion."

Further, throughout Sections 10.02 and 10.03, the interests subject to transfer restrictions are referred to as "Units."  As set forth in Section 10.01, "a transaction by which the Member assigns all or a portion of his Units, or any interest therein, to another Person" is a "transfer," and in Section 10.02, no "Units" may be "transferred" without extending a preferential offer to existing members under Section 10.03.

---

[25]     18 O.S. § 2001(15).

[26]     See, e.g., Condo v. Conners, 266 P.3d 1110, 1116-17 (Colo. 2011) (interpreting an operating agreement's provision that states that "a Member shall not sell, assign, pledge or otherwise transfer any portion of its interest [in the LLC] . . . without the prior written approval of all the Members" to include the assignment of the bare economic interest. "Because the right to receive distributions is a component of the membership interest, it is impossible to read Article 10.1's express limitation on the transfer of 'any portion' of a membership interest as anything other than a restriction on the assignment of such right.").

If none of the members expresses an interest in purchasing the selling member's interest, however, the second condition of Section 10.02 still prohibits the transfer to the unaffiliated third party unless the other members collectively sponsor and admit the transferee as a Substitute Member. It provides—

> Except for transfers to a Permitted Transferee, no Units may be transferred by a Member unless the following conditions are first satisfied:
>
> *****
>
> 2.  The transferee and each Member execute and file all documents necessary for the transferee to be a Substitute Member and be bound by the terms hereof and such transferee *is admitted* as a Substitute Member.[27]

Thus, when the Pinnacle Operating Agreement was executed, Pinnacle's members agreed among themselves that they would not sell, assign, pledge, mortgage or otherwise dispose of any interest in the company to an unrelated third party without first offering the interest to the members, and if the members passed on purchasing the interest, the transaction with the third party could not close unless the transferee was eligible to become a Substitute Member. Article XI of the Operating Agreement governs the admission of new and Substitute Members. To become a Substitute Member, the transferee must obtain "unanimous written consent" of the members.[28]

---

[27]    Pinnacle Operating Agreement § 10.02.

[28]    Id. § 11.01. While it may appear to be overkill to require a purchaser of an economic interest to qualify for and become a Substitute Member by unanimous consent, the requirement provides existing members maximum control over who may become a financial beneficiary of Pinnacle's business. In this case, such control is crucial to Pinnacle's survival. The transfer of the estate's substantial financial interest in Pinnacle to Trak would diminish Kramer's incentive to contribute his indispensable knowledge, experience, and performance as chief investment manager toward Pinnacle's financial success. Mr. Poarch testified that losing Kramer's key services would have a severe negative impact on Pinnacle's revenue and value to the other members. See, e.g.,Condo,

The Operating Agreement, viewed in its entirety, is unambiguous regarding the parties' intention to conduct business with and for the benefit of a close collection of individuals. The restrictive covenants unambiguously express the intent that no one member may force the other members to associate with or answer to any unrelated third party in connection with their private business enterprise. The scope of interests covered by transfer restrictions is broad. The list of transactions that constitute transfers subject to restrictions is unlimited. The transferring member and the third-party transferee must adhere to strict procedures and meet all requirements set forth in Article X. As a final check against unauthorized transfers to unwelcome third parties, Pinnacle's members promised each other that "[a]ny transfer or purported transfer of any Units not made in accordance with this Article X shall be null and void."[29] Accordingly, the Court concludes that Pinnacle's members intended that the procedures and restrictions contained in Article X of the Operating Agreement were prerequisites to an effective transfer of any piece, part

---

266 P.3d at 1113 (when members discovered that another member assigned his economic interest to his ex-wife in a divorce settlement without their consent, the members declared the assignment void and exercised their rights to purchase the interest after concluding that the transferring member was no longer incentivized to contribute to the company's financial success).

[29]    Pinnacle Operating Agreement § 10.01(B). This subsection (B) continues: "If for any reason any such transfer is not null and void, then the Assignee shall not be a Substitute Member, and shall have no right to participate in the Company's affairs as a Member thereof, but instead shall be entitled to receive only the share of profits or other compensation by way of income and the return of contributions to which the transferring Member would be entitled to receive the same." This provision comes into play after a transfer is made without complying with Article X, and after it is determined that the transfer is for some reason not null and void. It appears that such a determination must be made by the members or perhaps a tribunal. Because no transfer has been made at this point, this proviso is not applicable to Trustee's proposed sale.

or portion of, or any interest in, a membership interest, including a "capital interest," "economic interest," or a "right to distributions."

### 2. *The Oklahoma Limited Liability Company Act*

Trustee contends that even if Article X of the Pinnacle Operating Agreement can be construed to circumscribe transfers of the economic component of a member's interest, restrictions to such transfers are contrary to the Oklahoma Limited Liability Company Act (sometimes referred to as the "Act"), and are therefore unenforceable.

Section 2012.2(A) of the Act recognizes that a private agreement between and among a limited liability company and its members (an operating agreement) will govern matters of membership, management, activities, and operations, except to the extent that such agreement alters a statutorily mandated right or obligation. Section 2012.2(A) states:

> A.    The operating agreement of the limited liability company governs generally:
>
> 1.  Relations among the members as members and between the members and the limited liability company;
>
> 2.  The rights and duties under the Oklahoma Limited Liability Company Act of a person in the capacity of manager;
>
> 3.   The activities of the company and the conduct of those activities; and
>
> 4.   The means and conditions for amending the operating agreement.
>
> If the operating agreement does not otherwise provide, the Oklahoma Limited Liability Company Act governs the matter. *The operating agreement may not vary the rights, privileges, duties and obligations imposed specifically under the Oklahoma Limited Liability Company Act.*[30]

Trustee contends that the Pinnacle Operating Agreement varies and alters rights set forth in Section 2033(A) of the Act, which states—

---

[30]      18 O.S. § 2012.2(A) (emphasis added).

A.     Unless otherwise provided in an operating agreement:

1. A membership interest is not transferable; provided, however, that *a member may assign the capital interest associated with a membership interest in whole or part*.[31]

Thus, Trustee argues, Article X of the Pinnacle Operating Agreement is unenforceable with respect to his proposed sale of an economic interest because it "varies" a member's "right" to assign its capital interest, a "right" that is "imposed specifically" by subparagraph (1) quoted above.

Section 2033(A)(1) does not purport to impose mandatory non-variable rights and privileges, however.  The "right" to assign is prefaced by the phrase "[u]nless otherwise provided in an operating agreement." Section 2033(A) is one of many gap-filling provisions that govern a limited liability company and its members to the extent the subject matter is not specifically addressed in an operating agreement.[32]   Under the Act, the

---

[31]     18 O.S. § 2033(A)(1) (emphasis added).  For the purposes of the Act, "capital interest" is "the fair market value as of the date contributed of a member's capital contribution as adjusted for any additional capital contributions or withdrawals, a person's share of the profits and losses of a limited liability company and a person's right to receive distributions of the limited liability company's assets."  18 O.S. § 2001(5).

[32]     An example of a mandatory duty imposed specifically by the Act which cannot be varied in an operating agreement is found in Section 2030 of the Act.  This section prohibits a company from making distributions that would render the company unable to pay its debts as they come due or would result in balance sheet insolvency.  See 18 O.S. § 2030(A). Section 2030 does grant a company the option to exclude as liabilities certain members' preferential rights to distribution, and to subordinate the company's obligations to members to its general unsecured creditors by including such provisions in its operating agreement. Id. § 2030(A)(2) and (D). But other than these two permissible tweaks, the terms of the Act's restrictions on distributions pre-empt any conflicting terms in an operating agreement.

In contrast to Section 2030, Section 2033(A) is introduced by the phrase "[u]nless otherwise provided in an operating agreement," demonstrating that any or all of Section 2033(A)'s rules concerning assignability of interests may be altered by agreement.

statutory default position is that a membership interest in a limited liability company is non-transferrable. But if the operating agreement allows such transfers, the terms and conditions of the operating agreement control. So too with "capital interests." Those interests are freely assignable under the Act *unless* the applicable operating agreement precludes or conditions such an assignment.

The Pinnacle Operating Agreement conditions the assignment of membership interests, and portions and parts thereof, and interests therein, which the Court has found to include the economic portion of Kramer's interest, upon compliance with the terms and conditions set forth in Article X. Trustee is bound by the Operating Agreement. Accordingly, Trustee cannot sell or assign the estate's economic interest in Pinnacle without complying with the provisions of Article X.

## IV.   NAFA

### A.   Findings of Fact

NAFA was created in 1996 to furnish investment services to Native American tribes. NAFA has fourteen members, with a majority of the interests owned by Native Americans.  Pinnacle provides administrative and support services to NAFA, and Kramer, through Pinnacle, designs NAFA's investment strategies and manages its portfolios. On the petition date, Kramer owned 12.73% of NAFA's membership units. NAFA has five managers:  Kramer, Mr. Poarch, and three other NAFA members.  Kramer is also NAFA's tax partner.  The value of NAFA depends in large part upon Kramer's continued management of NAFA's business and his affiliation with Pinnacle.

Article X of the NAFA Operating Agreement[33] governs transfers of units, and contains the following relevant provisions:

**Section 10.01. <u>Transfer</u>**

A.      The term "transfer," when used in this Article X with respect to a Unit,[34] shall be deemed to refer to a transaction by which the Member assigns all or a portion of his or its Units, or any interest therein, to another Person, or by which the holder of a Unit assigns the Unit to another Person or Assignee, and includes a sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, transfer by will or intestate succession, exchange, or any other disposition.

B.      No Units shall be transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Article X, and any transfer or purported transfer of any Units not made in accordance with this Article X shall be null and void.

C.      Unless and until a transferee or Assignee[35] of Units transferred in accordance with this Article X is admitted as a Substitute Member pursuant to Article XI, any transferee or assignee shall have no right to participate in Company's affairs as a Member thereof, but instead shall be entitled to receive only the shares of profits or other compensation by way of income and the return of contributions to which the transferring Member would otherwise be entitled at the time said transferring Member would be entitled to receive the same.

*****

F.      Any holder of a Unit (including a transferee thereof) shall be deemed conclusively to have agreed to comply with and be bound by all terms and conditions of this Agreement, with the same effect as if such holder had executed an express acknowledgment thereof [.]")

**Section 10.02  <u>Transfer of Units by a Member</u>**

A.      No Units may be transferred by a Member unless the following conditions are first satisfied:

---

[33]      Debtor's Exhibit 2.

[34]      "Unit" "means the smallest whole measure representing an undivided ownership interest in the Company."  NAFA Operating Agreement at 4.

[35]      "'Assignee' means a Person to whom one or more Units have been transferred, by transfer or assignment or otherwise, in a manner permitted under this Agreement, and who has agreed to be bound by the terms of this Agreement but who has not become a Substitute Member."  <u>Id</u>. at 3.

1.      The written consent by Majority Vote[36] of the Members has been obtained;

2.      The transferee and the transferring Member execute and file all documents necessary for the transferee to be a Substitute Member and be bound by the terms hereof and such transferee is admitted as a Substitute Member; and

3.      The Company receives an Opinion of Counsel that such transfer would not materially adversely affect the classification of the Company as a partnership for federal and state income tax purposes.[37]

Trustee proposes to sell the economic interest in the estate's 12.73% interest in NAFA's outstanding units to Trak for the sum of $5,000, or if a competitive bid is submitted and an auction is held, to the highest bidder.  Kramer, as a manager of NAFA, and four other NAFA members object to the propose sale.[38]

B.      Conclusions of Law

For the same reasons set forth above, Trustee is bound by all enforceable terms of the NAFA Operating Agreement.  Kramer contends that Trustee cannot sell the estate's economic interest in NAFA to Trak (or to any other third party) without following the procedures contained in Article X of the NAFA Operating Agreement. Trustee again argues that the transfer provisions of the NAFA Operating Agreement do not apply to the sale of a bare economic interest.[39]

---

[36]      "'Majority Vote of the Members means the affirmative vote of more than two-thirds of the Members based on the number of Outstanding Units held by each Member." Id. at 4.

[37]      Id. at 11-12.

[38]      See Docs. 84, 95, and 99.

[39]      Trustee's alternative contention that NAFA's requirement for consent of the members is contrary to Oklahoma law is overruled as explained in Section III(B)(2) above.

Article X of the NAFA Operating Agreement governs "transfers" of "Units." In general, in the NAFA Operating Agreement, a "Unit" is "the smallest whole measure representing an undivided ownership interest in the Company."[40] Transfers of "Units" subject to the procedures and restrictive covenants of Article X, however, include transactions "by which the Member *assigns all or a portion of his or its Units, or any interest therein*[.]"[41] Thus, the term "Unit," when used in Article X, means not just the "undivided ownership interest" in NAFA, but also severable interests therein. Trustee has bifurcated the estate's ownership interest into economic and non-economic interests. His notice to sell just the economic interest seeks to assign "an[] interest therein" of the estate's Units, and therefore must satisfy the conditions of Article X.

Section 10.02 provides in pertinent part that "[n]o Units may be transferred by a Member unless . . . [t]he written consent by Majority Vote of the Members has been obtained."[42] A sale without the necessary consents would be "null and void."[43] Because it is undisputed that Trustee has not obtained the written consent of a majority of the members of NAFA, Kramer's objection to the sale of the estate's interests in NAFA is sustained.

---

[40]     NAFA Operating Agreement at 4.

[41]     Id. § 10.01(A) (emphasis added).

[42]     Id. § 10.02(A)(1).

[43]     Id. § 10.01(B).

V.      **PJ Oil**

A.      Findings of Fact

PJ Oil was formed in 1999 to hold mineral interests that Kramer and his siblings

inherited from their grandparents and great aunt.  On the petition date, Kramer, his brother,

and his sister each owned a one-third interest in PJ Oil.  Kramer has been the sole manager

and the tax matters partner, which duties he performs without compensation.

Article IX of the PJ Oil Operating Agreement[44] regulates transfers, and provides, in

pertinent part:

> Section 9.1  Transfers.  *Absent the consent of all Members, a Member may*
> *not assign or transfer his Interest or any portion thereof*; provided however,
> that assignments or transfers (in trust or otherwise) by a Member all or a
> portion of his Interest to another Member (so long as the Company has at
> least two Members at all times) or to or for the benefit of himself or, as
> applicable, a member of his "immediate family" or an "affiliate" . . . shall be
> permitted without such consent.   A permitted assignee or transferee of a
> Member's Interests shall not become a Member unless those holding a
> majority of the interests in the profits and capital of the Company (the
> "Capital and Profits Interests") (excluding the assigning or transferring
> Member) consent in writing to the assignment or transfer and the assignee or
> transferee complies with Section 9.5 hereof. Absent such consent and
> compliance, the permitted assignee or transferee of such Interest shall have
> no right to participate in the affairs of the Company and shall be entitled to
> receive only the share of profits or other compensation by way of income and
> return of contributions to which the assigning or transferring Member would
> otherwise be entitled.  [The remainder of Section 9.1 defines "immediate
> family" and "affiliate."].[45]

Article X of the PJ Oil Operating Agreement provides that if a member files for

bankruptcy relief, that member is "disqualified," and the company is dissolved unless the

---

[44]     Debtor's Exhibit 3.

[45]     PJ Oil Operating Agreement § 9.1 (emphasis added).

remaining members elect to continue the company.[46]  If the company is not dissolved, the remaining members "may elect . . . to have the Company purchase the Disqualified Member's interest in the Company upon such terms and conditions as the remaining Members and the Disqualified Member, or the legal representative of the Disqualified Member, may agree."[47]

Trustee proposes to sell the economic component of the estate's one-third interest in PJ Oil to Trak for the sum of $1,000, or if a competitive bid is submitted and an auction is held, to the highest bidder.  Kramer, in his capacity as manager of PJ Oil, objects on the grounds that the PJ Oil Members do not consent to such a transfer, and that Trustee does not recognize PJ Oil's preferential right to purchase the interest.[48]  The PJ Oil Members object on grounds that the sale "violates their right to repurchase, ignores preferences for immediate family members, and fails to request their consent to the transfer."[49]  Trustee contends that the PJ Oil's preferential right to purchase is an unenforceable *ipso facto* clause, and that the consent requirement does not apply to the transfer of a bare economic interest.[50]

---

[46]    Id. § 10.1.

[47]    Id. § 10.2.

[48]    Doc. 84 at 3.

[49]    Doc. 87 at 6.  The PJ Oil Members testified that they are willing to purchase the economic interest on the same terms as offered by Trak, and in the alternative, that they would consent to the sale of the interest to Kramer's four children on the same terms. Stipulation, Doc. 98, at 3.

[50]    Doc. 90.  Trustee also contends that PJ Oil's consent requirement is unenforceable as contrary to Oklahoma law.  As set forth in Section III(B)(2) herein, the Court concludes that the consent provision in the PJ Oil Operating Agreement is valid and enforceable.

B.      Conclusions of Law

Trustee is bound by all enforceable terms of the PJ Oil Operating Agreement.  The Court agrees with Trustee that the provisions of Article X that disqualify Kramer as a member, dissolve the company, and require sale of the estate's interest to PJ Oil are unenforceable *ipso facto* clauses because they "effect a forfeiture, modification, or termination of the debtor's interest in property" upon the commencement of a bankruptcy case.[51]

Article IX of the PJ Oil Operating Agreement is enforceable, however. Its provisions are not conditioned upon insolvency or bankruptcy. Section 9.1 of Article IX provides that, in general, "[a]bsent the consent of all Members, a Member may not assign or transfer his Interest or any portion thereof."[52]  Section 9.1 provides an exception to the unanimous consent rule in cases of transfers to another member, a member's trust, an immediate family member, or a member's affiliate ("Permitted Transferees").[53] It provides further that a transfer to a Permitted Transferee without consent of the other members conveys only the "Capital and Profits Interests" (*i.e.*, the economic rights) of the transferring member. A Permitted Transferee may join the company as a full-fledged member, and obtain the right to participate in governance, by complying with Section 9.5 of Article IX and obtaining consent from a majority of the other members.[54]  Nothing in

---

[51]     11 U.S.C. §§ 541(c) and 363*(l)*.

[52]     PJ Oil Operating Agreement § 9.1.

[53]     <u>Id.</u>

[54]     <u>Id.</u>

Article IX permits the transfer of a member's Capital and Profits Interests, or any other interests, to an *unrelated third party,* however, unless all members consent.

The PJ Oil Operating Agreement, read as a whole, demonstrates that the signatory members — Kramer, his brother and his sister — intended that the assets they inherited and contributed to PJ Oil would inure only to their own benefit and/or to the benefit of family members or close associates unless they all agreed otherwise. Trustee's proposed transfer of an interest akin to the Capital and Profits Interest to someone other than a Permitted Transferee is simply not allowed absent the unanimous consent of the PJ Oil Members.  The PJ Oil Members do not consent to the transfer of any portion of the estate's interest in PJ Oil to Trak or any other unaffiliated third party.  Accordingly, the objections to the proposed sale are sustained.

## VI. Plouton

### A.   Findings of Fact

Plouton was formed in January 2014 to hold and manage working interests in oil and gas properties.  Kramer is the sole manager of Plouton, a role for which he receives no compensation. On the petition date, Kramer owned a 60% interest in Plouton. Each of Kramer's four children has a 10% interest in the company.

Article X of the Plouton Operating Agreement[55] includes the following restrictions on transfers:

---

[55]   Debtor's Exhibit 4.

10.1    Restrictions On Transfer.  Each Member agrees that such Member will not, without the prior written consent of the Manager . . . and all Members holding Voting Units, make a transfer[56] of all or any portion of such Member's Units,[57] except in connection with, and strictly in compliance with the conditions of, any of the following:

(a)    Transfers effected pursuant to Sections 10.2, 10.3 and 10.6, in each case made in accordance with the procedures set forth therein; and

(b)    [Transfers to a Member's descendants or a trust benefiting such descendants].

*****

10.2    Right of First Refusal.  In the event that any of the Members receives a bona fide offer to purchase all or any portion of the Units held by such Member (a "Transaction Offer"), from any person (the "Offeror"), unless subject to one of the exceptions specified in Section 10.1, such Member (a "Transferring Member") may Transfer such Units only pursuant to and in accordance with the following provisions of this Section 10.2 and the provisions of Section 10.3.

(a)    Such Transferring Member shall cause the Transaction Offer to be reduced to writing and shall notify the Company, with a copy to each of the other Members, of such Transferring Member's desire to accept the Transaction Offer and otherwise comply with the provisions of Sections 10.2 and 10.3 (such notice, the "Offer Notice"). Any Offer Notice, once given, shall be deemed to be an irrevocable offer to sell the Offered Units as provided in this Section 10.2.

(b)    The following provisions establish the procedure by which the Company and/or the Other Members may elect to purchase the Units specified in the Offer Notice (the "Offered Units").  Any such purchase shall be at the same price and on the same terms as are offered by the Offeror . . . .

(c)    The Company shall have the right, prior to the right of the Other Members, to purchase all or a portion of the Offered Units . . . .

---

[56]    "Transfer" is defined as "any direct or indirect offer, transfer, donation, sale, assignment, pledge, hypothecation or other disposal or attempted disposal of all or any portion of a Unit." Plouton Operating Agreement at 3.

[57]    "Unit" means "a unit of interest representing an ownership interest in the Company." Id.

(d)     [If the Company does not purchase the Units], each Other Member shall have a right to purchase such Other Member's Proportionate Interest of the available Offered Units. . . .

10.5    Prohibited Transfers.   If any Transfer is made or attempted contrary to the provisions of this Agreement, (a) such purported Transfer shall be void ab initio; (b) the Company and the other Members shall have, in addition to any other legal or equitable remedies which they may have, the right to enforce the provisions of this Agreement by actions for specific performance (to the extent permitted by law); and (c) the Company shall have the right to refuse to recognize any Transferee as one of its Members for any purpose.[58]

Trustee proposes to sell the economic interest in the estate's 60% interest in Plouton to Trak for the sum of $1,000, or if a competitive bid is submitted and an auction is held, to the highest bidder. Kramer, as manager of Plouton, objects to the proposed sale because the offer does not comply with the requirements of Article X of the Plouton Operating Agreement.  Plouton, through its manager, Kramer, seeks to exercise its right to purchase the estate's interest at the same price as offered by Trak.  Plouton's four other members likewise object to the sale, and to the extent that Plouton does not purchase the estate's interest, they intend to exercise their rights of first refusal to purchase the same.[59]

B.    Conclusions of Law

For the same reasons set forth above, Trustee is bound by all enforceable terms of the Plouton Operating Agreement.  Kramer contends that Trustee cannot sell the estate's economic interest in Plouton to Trak (or to any other unrelated third party) without

---

[58]     Id. at 10-14.  The Court notes that Section 10.6 of the Plouton Operating Agreement is a buy-sell provision triggered by an involuntary transfer of Units as a result of divorce or bankruptcy. Section 10.6 is an unenforceable *ipso facto* clause under 11 U.S.C. §§ 541(c) and 363*(l)*.

[59]     See Stipulation, Doc. 98.

following the procedures contained in Article X of the Plouton Operating Agreement. Trustee again argues that selling a bare economic interest does not require compliance with the transfer provisions of the Plouton Operating Agreement.[60]

Under the Plouton Operating Agreement, a "Unit" is "a unit of interest representing an ownership interest in the Company."[61] The restrictions on transfer set forth in Article X specifically apply to "all or any portion of [a member's] Units."[62] Under Section 10.2, if a member "receives a bona fide offer to purchase all or any portion of the Units" from an unrelated third party, the member must reduce the offer to writing and extend to Plouton and its other members the right to purchase the same interest for the same price and under the same terms as offered by the third party.[63] These procedures are mandatory unless waived by "written consent of the Manager . . . and all Members holding Voting Units."[64] In entering into the Operating Agreement, Plouton's members agreed to "strict" compliance with Article X's procedures and restrictions,[65] agreed that transfers made or attempted contrary to these restrictions are "void ab initio;"[66] and further agreed that Plouton and its members have a right to seek specific performance of Article X.[67] The

---

[60]   Trustee's argument that Plouton's transfer restrictions are pre-empted by the Oklahoma Limited Liability Company Act is rejected for the reasons set forth in Section III(B)(2) hereof.

[61]   Plouton Operating Agreement at 3.

[62]   Id. §§ 10.1.

[63]   Id. § 10.2(a)-(d).

[64]   Id. § 10.1.

[65]   Id.

[66]   Id. § 10.5.

[67]   Id.

provisions of Article X powerfully manifest the parties' intention that all interests in Plouton would remain closely held by Kramer, his children, and their descendants.

Trustee has stepped into Kramer's shoes as a member of Plouton.  The estate's right to the financial benefits from Plouton's activities is a "portion" of its membership interest, and thus Trustee is obligated to satisfy the requirements of Article X of the Plouton Operating Agreement.  Plouton and the Plouton Members have rights of first refusal under Article X.  To the extent that Trustee seeks to sell the interest without complying with Article X, he would need "written consent of the Manager,"[68] *i.e.*, Kramer.  Kramer has made clear that consent will not be forthcoming.  Plouton, through Kramer, gave notice of its intent to purchase the interest for $1,000—the price offered by Trak.  The four Plouton Members are also ready, willing, and able to purchase the interest for $1,000 on a pro rata basis.

The Court concludes that Kramer's and the Plouton Members' objections to the Sale Notice are sustained.

## VII.   Conclusion

The objections to Trustee's Sale Notice are sustained.  Trustee may not sell the estate's economic interests in the LLCs without complying with the provisions of the applicable Operating Agreements.

**SO ORDERED** this 16th day of February, 2021.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

---

[68]   Id. § 10.1.