Filed/Docketed
Feb 08, 2022

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No. 19-12014-R** |
| **KRAMER, ROBERT BRETT,** | ) | **Chapter 7** |
| | ) | |
| **Debtor.** | ) | |

**SUPPLEMENTAL REPORT**

Before the Court is the Limited Remand Order (Doc. 138) issued by the Bankruptcy Appellate Panel ("BAP") in BAP Appeal Nos. NO-21-005 and NO-21-006 (consolidated for briefing). The appeals concern this Court's Order Regarding Trustee's Notice to Sell Personal Property ("Order"). In the Order, the Court sustained objections made to the Chapter 7 Trustee's proposed sale of economic interests in several limited liability companies of which Debtor Robert Brett Kramer ("Kramer") was a member, including objections to the proposed sale of Kramer's 23% interest in 2006 Pinnacle Holdings, LLC ("Pinnacle"). This Court held that the Chapter 7 Trustee could not sell the estate's interest in the companies without complying with the restrictions on transfer, such as rights of first refusal, that the members of the companies agreed to in their operating agreements.

Both Chapter 7 Trustee Patrick J. Malloy, III ("Trustee"), and the disappointed proposed purchaser Trak-1 Technology, Inc. ("Trak") (collectively "Appellants"), appealed the Order. In briefing the appeal, Appellants quoted from and referred to two different versions of the operating agreement governing the affairs of Pinnacle, one being an agreement dated January 2, 2006 ("Original Agreement") and the second an amended and restated agreement dated December 12, 2009 ("Amended Agreement").

Because this Court's Order refers only to the Original Agreement, the BAP entered a Limited Remand Order to obtain clarification of the content of the trial court record. The remand is limited to making "additional findings or explanations"[1] "(i) to resolve whether the Amended Pinnacle Agreement was admitted into evidence and (ii) to amend the [Order] in light of the Amended Pinnacle Agreement if and as the Bankruptcy Court deems appropriate."[2] And although the BAP retains jurisdiction over the appeals, it granted this Court leeway to "take any actions that are appropriate under the circumstances to address the ambiguity regarding the Amended Pinnacle Agreement, including (if appropriate) requiring the parties to file further briefing on any relevant issue, holding a status conference or other hearing, taking and considering additional evidence, and amending its [Order]"[3] and to "indicate [in an amended Order or supplemental report] whether the Amended Pinnacle Agreement was admitted into evidence at the original telephonic evidentiary hearing, or was admitted into evidence on remand."[4]

In addressing the issue on remand, the Court has reviewed the following documents filed in this bankruptcy case:

- Trustee's Notice to Sell Personal Property (Doc. 79);
- [Kramer's] Objection to Trustee's Notice to Sell Personal Property (Doc. 84);
- Trustee's Response to Objection to Trustee's Notice to Sell Personal Property Filed by the Debtor Robert Brett Kramer Individually and in his

---

1 Limited Remand Order at 5.

2 Id. at 4.

3 Id. at 5-6, ¶ 4.

4 Id. at 6, ¶ 5.

Capacity as Member and Manager of Pinnacle Holdings, LLC, Native American Fund Advisors, LLC, P.J. Oil LLC and Plouton Petrol LLC . . . ("Trustee's Response") (Doc. 88);

- Order Setting Telephonic Evidentiary Hearing (Doc. 94);
- Reply to Trustee's Response to Debtor's Objection to Trustee's Notice to Sell Personal Property (Doc. 95);
- Stipulation [of non-consent of certain LLC members] (Doc. 99);
- Stipulation and Order Regarding Custody of Exhibits (Doc. 101);
- Order Regarding Trustee's Notice to Sell Personal Property (Doc. 102);
- Transcript of Hearing held on December 15, 2020 (Doc. 131); and
- Limited Remand Order (Doc. 138).

The Court also reviewed the exhibit lists submitted to the Court and all exhibits tendered to the Court in connection with the evidentiary hearing held on December 15, 2020 ("Sale Hearing").

In addition, the Court reviewed the Stipulated Motion to Supplement Appellate Record and Provide Additional Relief ("Stipulated Motion") that was filed with the BAP as Docket No. 55. Attached to the Stipulated Motion as Exhibit A is the Amended and Restated Operating Agreement of 2006 Pinnacle Holdings, LLC, dated December 12, 2009. Appellant Trak and Appellee Kramer stipulated that the appellate record should be supplemented to include the Amended Agreement represented by Exhibit A.[5] Appellant Trak and Appellee Kramer also stipulated that the Amended Agreement "arguably governs" the rights and obligations of Pinnacle's members at the time the Court heard this contested matter.[6] Thus, the Court has also reviewed the Amended Agreement.

---

[5] Stipulated Motion at ¶ 6.

[6] Id.

**A. Exhibits offered and admitted at the Sale Hearing.**

Under the Court's COVID-19 protocol, the Sale Hearing was conducted telephonically. In the order setting the Sale Hearing, the Court ordered the parties to submit their proposed trial exhibits to the Court electronically. The order provided—

> *Counsel shall present all evidence necessary for the Court's full consideration and determination of the matter. Copies of pre-marked exhibits to be introduced at the hearing, and a list of witnesses intended to be called, shall be submitted to the Court by email to rasure.orders@oknb.uscourts.gov no later than **5:00 p.m.** on **December 7, 2020**. Copies of the pre-marked exhibits and witness lists shall be exchanged with other parties in interest in a manner calculated to be received on the same day they are submitted to the Court.*[7]

Kramer's counsel emailed his Exhibit List and twenty-four pre-marked exhibits to the Court. On his Exhibit List, Kramer's Exhibit 1 was identified as the "Operating Agreement of 2006 Pinnacle Holdings, LLC." The document submitted to the Court as Kramer's Exhibit 1 was the Original Agreement.

Trustee emailed his Exhibit List to the Court, but did not submit any pre-marked exhibits by email or otherwise. Trustee, like Kramer, described his Exhibit 1 as "Operating Agreement of 2006 Pinnacle Holdings, LLC." Kramer and Trustee also described their Exhibits 2, 3 and 4 – the other three operating agreements at issue – identically on their Exhibit Lists.

Trak did not submit an Exhibit List or any exhibits, by email or otherwise.

---

7 Order Setting Telephonic Evidentiary Hearing (Doc. 94) at 2.

At the Sale Hearing, the Court admitted Trustee's Exhibits 1 through 4 and Kramer's Exhibits 1 through 4, believing that both parties were offering the same documents. The Court assumed that Trustee and Kramer's counsel had reviewed each other's exhibits. When the Court pointed out that Trustee's Exhibits 1 through 4 were the same as Kramer's Exhibits 1 through 4, Trustee appeared to agree.[8] Because Trustee did not submit his proposed exhibits to the Court, only one version of Pinnacle's operating agreement was in evidence – the Original Agreement submitted by Kramer. Neither Trustee nor Trak objected to the relevance of Kramer's Exhibit 1.

It bears noting that in his written response to Kramer's objection, Trustee quoted provisions of the *Original* Agreement, and attached pages of the *Original* Agreement to his response as Exhibits A, B, C and D.[9] Also, at the Sale Hearing, Trak's counsel argued that Article X's transfer restrictions governed transfers by a "Member," and that Trustee was not a Member.[10] Although the *Original* Agreement regulates transfers by Members, the Amended Agreement substitutes the term "Record Holder" for "Member" in Article X.[11] None of the parties used the term "Record Holder" in their pleadings, in their presentation of evidence, or in their arguments.

In summary, the Amended Agreement was not admitted into evidence at the Sale Hearing, and the circumstances suggest that Trustee did not intend to introduce the

---

8 Transcript of Hearing held on December 15, 2020 (Doc. 131) ("Tr.") at 7.

9 Trustee's Response (Doc. 88).

10 Tr. at 86-87, 95-96.

11 Amended Agreement at 14-20.

Amended Agreement into the evidentiary record as his Exhibit 1. None of the counsel participating in the hearing challenged the admission and relevance of the Original Agreement submitted by Kramer, nor did Trustee or Trak's counsel refer to or quote from the Amended Agreement at any point.

**B. Supplemental Conclusions of Law**

Kramer and Trak have stipulated that the Amended Agreement "arguably governs" the rights of Pinnacle members, and the conditions and restrictions on transfer of interests in Pinnacle, at the time of the Sale Hearing.[12] Having reviewed the Amended Agreement, the Court concludes that had it been admitted into evidence, the outcome of the proceeding would not have changed. The Court submits the following analysis in support thereof.

*1. Restrictive Covenants in the Amended Agreement.*

The following provisions of the Amended Agreement are relevant to transfers and sales of interests in Pinnacle:

> ARTICLE X
> Transfer of Units
>
> Section 10.01. Transfer
>
> A. The term "transfer," when used in this Article X with respect to a Unit,[13] shall be deemed to refer to *a transaction by which the Record*

[12] Stipulated Motion at 5, ¶ 6.

[13] "'Unit' means the ownership interest in the Company representing a right to share in the profit and loss of the Company, cash available for distribution and liquidating distributions, and to vote to the extent and in the manner provided by the Agreement and the Act." Amended Agreement at 5.

*Holder*[14] *assigns all or a portion of his Units, or any interest therein, to another Person*,[15] and includes a sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, transfer by will or intestate succession, exchange, or any other disposition.

B. *No Units shall be transferred, in whole or in part, except in accordance with the terms and condition[s] set forth in this Article X.* Any transfer or purported transfer of any Units not made in accordance with this Article X shall be *null and void*. An Assignee[16] shall not be a Substitute Member, and shall have no right to participate in the Company's affairs as a Member thereof, but instead shall be entitled to receive only the share of profits, distributions or other economic interest to which the transferring Member would be able to receive the same [sic].

Section 10.02. Transfer of Units by a Record Holder.

A. Except for transfers to a Permitted Transferee,[17] *no Units may be transferred by a Record Holder unless the Preferential Offer pursuant to Section 10.03 has been made and concluded.*

*****

E. Any holder of a Unit (including a transferee thereof) shall be deemed conclusively to have agreed to comply with and be bound by all terms and conditions of this Agreement, with the same effect as if such holder had executed an express acknowledgement thereof, whether or not such holder has executed an express acknowledgement thereof.

---

14 "'Record Holder' means a Person in whose name such Unit is registered on the books and records of the Company as of the close of business on a particular Business Day, and includes a Member and an Assignee." Id. at 4.

15 "'Person' means a natural person, partnership, domestic or foreign limited partnership, domestic or foreign limited liability company, trust, estate, association or corporation." Id. at 4.

16 "'Assignee' means a Person to whom one or more Units have been transferred, by transfer or assignment or otherwise, *in a manner permitted under this Agreement*, and who has agreed to be bound by the terms of this Agreement but who has not become a Substitute Member." Id. at 2 (emphasis added).

17 "'Permitted Transferee' means (1) each existing Member who is a party to this Agreement or; (2) a descendant or spouse of a Member, . . . or; (3) a trust created for the primary benefit of anyone in (1) or (2) above; or (4) a 501(c)(3) tax exempt organization; or (5) a corporation or other legal entity in which the transferor or Member owns all the equity and has full voting control." Id. at 4.

*****

Section 10.03. Preferential Offer.

A. *In the event a Record Holder desires to sell all or any portion of his membership interest in the Company ("Transaction Offer") to a third party purchaser ("Proposed Purchase[r]") other than a Permitted Transferee*, the Selling Record Holder shall obtain from such third party a bona fide written offer to purchase such interest in the Company, stating the terms and conditions upon which the purchase is to be made and the consideration therefor. The Selling Record Holder shall give written notification to the remaining Members . . . by certified mail or personal delivery, of his intention to so transfer such membership interest in the Company, furnishing to the remaining Members a copy [of the written offer].

B. *The Members, and each of them shall, [on a pro rata basis], have the right to exercise a right of first refusal to purchase all, but not fewer than all, the Units proposed to be sold by the Selling Record Holder upon the same terms and conditions as stated in the aforesaid written offer to purchase.* . . . [The remainder of subsection B sets forth procedures and timelines for exercising rights of first refusal].

C. In the event of the purchase of the Selling Record Holder's Units in the Company by a third party purchaser, and as a condition to recognizing the effectiveness and binding nature of any such sale, the Members may require the Selling Record Holder and the proposed purchaser, transferee, or assignee, to execute, acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Members may deem necessary or desirable. . . . [18]

Trustee proposed to sell the economic component of Kramer's membership interest in Pinnacle (*i.e.*, the right to receive Kramer's 23% share of Pinnacle's distributions) to Trak for $5,000, or, if a competitive bid was submitted and an auction held, to the highest bidder. First, it is important to note that Trustee acknowledges, as he must, that Trustee's proposed transfer is subject to all *enforceable* terms of the operating agreement.[19] The

[18] Amended Agreement at 14-17 (emphasis added).

[19] The transfer restrictions in Article X of the Amended Agreement are not so-called *ipso facto* clauses rendered unenforceable by 11 U.S.C. §§ 541(c) and/or 363(*l*). Article

Amended Agreement is a private agreement among its members. Trustee's desire and obligation to maximize the return on estate assets cannot alter or supplant the rights conferred upon Pinnacle's members in their operating agreement. The Tenth Circuit has held:

> One of the central precepts of bankruptcy law is that
>
> > a bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition. Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest. Further, a trustee takes the property subject to the same restrictions that existed at the commencement of the case. *To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate.*
>
> In re Sanders, 969 F.2d 591, 593 (7th Cir.1992) (citations and quotations omitted); see also COLLIER ON BANKRUPTCY ¶ 541.01 at 541–8.3 (15th ed. rev. 2009) ("Subdivision (d) of [§ 541] makes clear that the estate can only succeed to the same property interest that the debtor possesses, and cannot achieve a greater interest.").[20]

---

X's restrictive covenants are not conditioned on a member's insolvency or triggered by the commencement of a bankruptcy case. Trustee claims, however, that the Oklahoma Limited Liability Company Act renders unenforceable any operating agreement provision that restricts the sale of bare economic interest in a limited liability company. The Court will address this argument later in this supplemental report.

[20] In re Graves, 609 F.3d 1153, 1156 (10th Cir. 2010) (emphasis added). See also Sheehan v. Warner (In re Warner), 480 B.R. 641, 656-57 (Bankr. N.D. W.Va. 2012) ("The estate succeeds to no more interest than the debtor had, and the estate takes its interest subject to the conditions under which the debtor held the interest" (internal quotes and citations omitted)); In re Cap. Acquisitions & Mgmt. Corp., 341 B.R. 632, 638 (Bankr. N.D. Ill. 2006) (Trustee "took [Debtor's] property rights as it found them on the date of the petition. [Debtor's] interest in [the LLC] is subject to this right of first refusal, and that is how the [Trustee] must sell it"); Rice v. Shoney's Inc. (In re Dean), 174 B.R. 787, 791 (Bankr. E.D. Ark. 1994) ("trustee succeeds to all of the rights of the debtor, including restrictions on transfers and options of others to purchase"). See also 3 COLLIER ON BANKRUPTCY ¶ 363.10[1] ("[A] restrictive covenant limiting who may own a property will not prevent the property from entering the estate, and indeed from being used by the trustee,

Kramer argued that Trustee cannot sell the estate's economic interest in Pinnacle to Trak (or to any other unaffiliated third party) without following the procedures contained in Article X of Pinnacle's operating agreement, particularly Section 10.03 which, in both versions of the agreement, affords Pinnacle's other members rights to acquire the interest under the same terms offered by Trak. Trustee argues that Pinnacle's members' rights of first refusal are not triggered unless a member proposes to sell "all or any portion of his **membership interest**"[21] to a third party. Trustee contends that the carved-out economic interest is not a "membership interest."

Resolution of this dispute calls for construction and interpretation of the operating agreement. The Amended Agreement provides that it "shall be construed in accordance with and governed by the laws of the State of Oklahoma."[22]

---

but it would effectively limit the trustee's ability to sell the property to an entity other than one qualified under the restrictive covenant. General transfer restrictions, to the extent enforceable under applicable nonbankruptcy law, such as a limitation on the identity or affiliation of a buyer or a right of first refusal, are enforceable.").

Oklahoma law also recognizes that every transferee of a limited liability interest, including an assignee of a capital interest, is bound by the operating agreement. See 18 O.S. § 2012.2(B) ("A member or manager of a limited liability company or an assignee of a capital interest is bound by the operating agreement regardless of whether the member, manager or assignee executes the operating agreement"). See also Amended Agreement § 10.02(E) ("Any holder of a Unit (including a transferee thereof) shall be deemed conclusively to have agreed to comply with and be bound by all terms and conditions of this Agreement, with the same effect as if such holder had executed an express acknowledgment thereof, whether or not such holder has executed an express acknowledgment thereof.").

21 Doc. 88 at 3 (Trustee's emphasis).

22 Amended Agreement § 15.09.

Under Oklahoma law,

> [a] contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context. The language in a contract is given its plain and ordinary meaning unless some technical term is used in a manner meant to convey a specific technical concept. The court must interpret a contract so as to give effect to the intent of the parties at the time the contract was formed.[23]

Upon review of the Amended Agreement, and considering it as a whole to give effect to all its provisions and to the intention of the parties, the Court concludes that Trustee's proposed sale and transfer of the economic benefits of the estate's interest in Pinnacle is subject to all procedures and restrictions set forth in Article X.

Article X governs the "Transfer of Units." A "'Unit' means the ownership interest in the Company representing a right to share in the profit and loss of the Company, cash available for distribution and liquidating distributions, and to vote to the extent and in the manner provided by the Agreement and the Act."[24] "The term 'transfer,' when used in this Article X with *respect to a Unit*, shall be deemed to refer to a transaction by which the Record Holder assigns all or a portion of his Units*, or any interest therein,* to another Person."[25] Trustee's proposed sale of Kramer's 23% share the economic interest of Kramer's Units (*i.e.*, profits, losses, cash distributions and liquidating distributions) falls within the plain meaning "any interest therein" of a "Unit." Section 10.01 further provides

---

23 Mercury Inv. Co. v. F.W. Woolworth Co., 1985 OK 38, 706 P.2d 523, 529 (footnotes and citations omitted).

24 Amended Agreement at 5. While the Original Agreement defined "Unit" as "representing an interest in the Company," the Amended Agreement breaks down the component rights that comprise a Unit.

25 Id. § 10.01(A) (emphasis added).

that "[n]o Units shall be transferred, in whole *or in part*, except in accordance with the terms and condition[s] set forth in this Article X."[26] This admonition also recognizes that an effort to transfer "parts" of Units is subject to the restrictions of Article X.

For the purposes of Article X, a "transfer" includes "a sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, transfer by will or intestate succession, exchange or any other disposition."[27] Accordingly, *any* transaction that purports to convey *any* interest in or part of *any* Unit to *any* other person or entity is a "transfer" governed by Article X.

At this point, a digression is necessary to address whether the Amended Agreement's substitution of the term "Record Holder" for the term "Member" in Article X in the Original Agreement undermines Kramer's objection to the sale. The short answer is no. While Article X in the Original Agreement governed transfers by a "Member," the Amended Agreement identifies the proposed transferor instead as a "Record Holder." In the Amended Agreement, "Record Holder" is defined as "a Person in whose name such Unit is registered on the books and records of the Company as of the close of business on a particular Business Day, and includes a Member and an Assignee."[28] So under the Amended Agreement, Article X's restrictions apply not only to full-fledged Members (as was the case in the Original Agreement), but also to Assignees of a Member. The Amended Agreement defines "Assignee" as "a Person to whom one or more Units have been

---

26 Id. §10.01(B).

27 Id. § 10.01(A).

28 Id. at 4.

transferred, by transfer or assignment or otherwise, in a manner permitted under this Agreement, and who has agreed to be bound by the terms of this Agreement but who has not become a Substitute Member."[29] The Amended Agreement appears to close a loophole in the Original Agreement that arguably allowed an Assignee to transfer its interest in a Unit free of the restrictions placed on the Member.

The substitution of "Record Holder" for "Member" has no effect on the Court's previous analysis. There is no dispute that Kramer was the Member (under the Original Agreement) and the Record Holder (under the Amended Agreement) whose economic interest Trustee planned to sell to an unrelated third party. Upon commencement of the bankruptcy case, the estate acquired only the rights Kramer had in Pinnacle at that time.[30] Kramer had no rights in Pinnacle other than those defined and conferred by the Amended Agreement, *i.e.*, contractual rights. On the petition date, Kramer could not have transferred his Units, *or any part of his Units, or any interest in his Units,* without complying with the substantive and procedural provisions of Article X. The bankruptcy estate succeeded to Kramer's rights in Pinnacle with all such limitations and conditions. Trustee, acting on behalf of the estate, is bound by those limitations.

Next, Section 10.02(A) provides, in part—

> Except for transfers to a Permitted Transferee [*i.e.*, a member's trust, wholly owned entity, or close family member], no Units may be transferred by a

---

[29] Id. at 2.

[30] See Graves, 609 F.3d at 1156.

> Record Holder unless the Preferential Offer pursuant to Section 10.03 has been made and concluded[.][31]

By executing the Amended Agreement, Pinnacle's members (including Kramer, whose metaphorical shoes Trustee now wears) agreed that Units (which, under Section 10.01(A), includes any interest in a Unit) could not be transferred to a non-affiliated third party without complying with the Preferential Offer requirements.

In Section 10.03, entitled "Preferential Offer," Pinnacle's members agreed that a Record Holder of Units seeking to sell *any portion* of his interest to an unaffiliated third party must extend to all other members the opportunity to exercise rights of first refusal. It states—

> A. In the event a Record Holder desires to sell all or any portion of his membership interest in the Company ("Transaction Offer") to a third party purchaser ("Proposed Purchase[r]") other than a Permitted Transferee, the Selling Record Holder shall obtain from such third party a bona fide written offer to purchase such interest in the Company, stating the terms and conditions upon which the purchase is to be made and the consideration therefor . . .
>
> B. The Members, and each of them shall, [on a pro rata basis], have the right to exercise a right of first refusal to purchase all, but not fewer than all, the Units proposed to be sold by the Selling Record Holder on the same terms and conditions as stated in the aforesaid written offer to purchase[.][32]

Trustee argues that the economic interest he proposes to sell is not a "membership interest" and therefore he is not required to comply with Section 10.03. The Amended

---

[31] Amended Agreement § 10.02(A).

[32] Id. § 10.03(A) and (B) (emphasis added).

Agreement does not define "membership interest," but the Oklahoma Limited Liability Company Act does. According to the Act, a "membership interest" is--

> a member's rights in the limited liability company, collectively, including the member's share of the profits and losses of the limited liability company, the right to receive distributions of the limited liability company's assets, and capital interest, any right to vote or participate in management, and such other rights accorded to members under the articles of organization, operating agreement, or the Oklahoma Limited Liability Company Act.[33]

The definition of "Unit" in the Amended Agreement closely approximates the Act's definition of "membership interest." A "Unit" is "the ownership interest in the Company representing a right to share in the profit and loss of the Company, cash available for distribution and liquidating distributions, and to vote to the extent and in the manner provided by the Agreement and the Act."[34] Thus, the Court interprets "membership interest" in Section 10.03 to mean "Units." Under Section 10.02, no "Units" may be "transferred" without extending a preferential offer to existing members under Section 10.03. Section 10.03 states that its provisions apply to the sale of "any portion" of the seller's "membership interest" or "Units."[35] Trustee has apportioned Kramer's rights into economic interests and non-economic interests, and intends to sell the economic "portion."

---

33 18 O.S. § 2001(15).

34 Amended Agreement at 5.

35 Amended Agreement § 10.03(A). See Condo v. Conners, 266 P.3d 1110, 1116-17 (Colo. 2011) (interpreting an operating agreement's provision that states that "a Member shall not sell, assign, pledge or otherwise transfer any portion of its interest [in the LLC] . . . without the prior written approval of all the Members" to include the assignment of the bare economic interest. "Because the right to receive distributions is a component of the membership interest, it is impossible to read Article 10.1's express limitation on the transfer of 'any portion' of a membership interest as anything other than a restriction on the assignment of such right.").

The Amended Agreement, viewed in its entirety, is unambiguous regarding the parties' intention to conduct business with and for the benefit of a close collection of individuals. The restrictive covenants unambiguously express the intent that no one Member, or Assignee of a Member, may force the other members to associate with or answer to any unrelated third party in connection with their private business enterprise.[36] The scope of interests covered by transfer restrictions is broad. The list of transactions that constitute transfers subject to restrictions is unlimited. The transferring Member or Assignee and the third-party transferee must adhere to strict procedures and meet all requirements set forth in Article X. As a final check against unauthorized transfers to unwelcome third parties, Pinnacle's members promised each other that "[a]ny transfer or purported transfer of any Units not made in accordance with this Article X shall be null and void."[37] Accordingly, the Court concludes that Pinnacle's members intended that the

---

36 The Oklahoma Supreme Court upheld the right of first refusal as a reasonable restriction on transfer of stock in a closely held corporation, stating:

> The usual purpose of shareholders' agreements which restrict the sale of corporate stock is to prevent transfers to outsiders without first providing an opportunity for the shareholders to acquire the stock. The agreement evolved as a device to assure the succession in interest of persons most likely to act in harmony with the other stockholders. Stock in a corporation creates a personal relationship analogous to a partnership, and shareholders in a close corporation should have the same right to choose one's associates in a corporation as in a firm. Restrictive agreements designed to prevent sale of stock to outsiders must be strictly construed and cannot be applied to transactions which are not expressly mentioned in the agreement; nor can they be enlarged by implication.

Renberg v. Zarrow, 1983 OK 22, 667 P.2d 465, 469 (citations omitted).

37 Amended Agreement § 10.01(B). In the Original Agreement, this subsection (B) provided as follows:

procedures and restrictions contained in Article X of the Operating Agreement be prerequisites to an effective transfer of any piece, part or portion of, or any interest in, a membership interest, including a "capital interest," "economic interest," or a "right to distributions."

*2. The Oklahoma Limited Liability Company Act*

Trustee contends that even if Article X of the Pinnacle's operating agreement[38] can be construed to circumscribe transfers of the economic component of a member's interest,

---

> *if for any reason any such transfer is not null and void,* then the Assignee shall not be a Substitute Member, and shall have no right to participate in the Company's affairs as a Member thereof, but instead shall be entitled to receive only the share of profits or other compensation by way of income and the return of contributions to which the transferring Member would be entitled to receive the same [sic].

Original Agreement § 10.01(B). At the Sale Hearing, Trak's counsel argued that this language suggested that Trustee could sell Kramer's economic interest without complying with Article X, because this section contemplated a non-compliant sale with the purchaser receiving only the Member's economic interest. Tr. at 87. In the Amended Agreement, however, Pinnacle's members eliminated the language "if for any reason such transfer is not null and void." Thus, non-compliant transfers are simply null and void.

The Amended Agreement retained the language of the Original Agreement limiting the rights of an *Assignee* to the receipt of "the share of profits or other compensation by way of income and the return of contributions to which the transferring Member would be entitled to receive." Amended Agreement § 10.01(B). But under the Amended Agreement, an Assignee, by definition, must acquire its interest "*in a manner permitted under this Agreement,*" *i.e.*, through a compliant transfer. Id. at 2.

For these reasons, the amendment of Section 10.01(B) defeats Trak's argument that Pinnacle members envisioned non-compliant transfers such as the one proposed by Trustee, and that the transferee of such a non-compliant transfer was entitled to the Member's economic benefits.

[38] Trustee's argument that the Act precludes enforcement of transfer restrictions on purely economic interests, and the Court's analysis thereof, is the same under both the Original Agreement and the Amended Agreement. Therefore, the Court will refer to Pinnacle's operating agreement in generic terms.

restrictions to such transfers are contrary to the Oklahoma Limited Liability Company Act (sometimes referred to as the "Act"), and are therefore unenforceable.

Section 2012.2(A) of the Act recognizes that a private agreement between and among a limited liability company and its members (an operating agreement) will govern matters of membership, management, activities, and operations, except to the extent that such agreement alters a statutorily mandated right or obligation. Section 2012.2(A) states:

> A. The operating agreement of the limited liability company governs generally:
>
> 1. Relations among the members as members and between the members and the limited liability company;
>
> 2. The rights and duties under the Oklahoma Limited Liability Company Act of a person in the capacity of manager;
>
> 3. The activities of the company and the conduct of those activities; and
>
> 4. The means and conditions for amending the operating agreement.
>
> If the operating agreement does not otherwise provide, the Oklahoma Limited Liability Company Act governs the matter. *The operating agreement may not vary the rights, privileges, duties and obligations imposed specifically under the Oklahoma Limited Liability Company Act*.[39]

Trustee contends that Pinnacle's operating agreement varies rights and privileges set forth in Section 2033(A) of the Act. Section 2033(A) provides—

> A. Unless otherwise provided in an operating agreement:
>
> 1. A membership interest is not transferable; provided, however, that *a member may assign the capital interest associated with a membership interest in whole or part*.[40]

---

[39] 18 O.S. § 2012.2(A) (emphasis added).

[40] 18 O.S. § 2033(A)(1) (emphasis added). For the purposes of the Act, "capital interest" is "the fair market value as of the date contributed of a member's capital contribution as adjusted for any additional capital contributions or withdrawals, a person's

Trustee argues that the transfer restrictions in Pinnacle's operating agreement attempt to eliminate a member's absolute right and privilege to assign its economic interest, a right "imposed specifically" in Section 2033(A). Section 2033(A)(1) does not purport to impose mandatory non-variable rights and privileges, however.[41] The supposed "right" to assign a capital interest is prefaced by the phrase "[u]nless otherwise provided in an operating agreement." Section 2033(A) is one of many gap-filling provisions that govern a limited liability company and its members to the extent the subject matter is not specifically addressed in an operating agreement. Under the Act, the statutory default position is that a membership interest in a limited liability company is non-transferrable. But if the operating agreement allows such transfers, the terms and conditions of the operating agreement control. So too with "capital interests." Those interests are freely

share of the profits and losses of a limited liability company and a person's right to receive distributions of the limited liability company's assets." 18 O.S. § 2001(5).

[41] An example of a mandatory duty imposed specifically by the Act which cannot be varied in an operating agreement is found in Section 2030 of the Act. This section prohibits a company from making distributions that would render the company unable to pay its debts as they come due or would result in balance sheet insolvency. See 18 O.S. § 2030(A). Section 2030 does grant a company the option to exclude as liabilities certain members' preferential rights to distribution, and to subordinate the company's obligations to members to its general unsecured creditors by including such provisions in its operating agreement. Id. § 2030(A)(2) and (D). But other than these two permissible tweaks, the terms of the Act's restrictions on distributions pre-empt any conflicting terms in an operating agreement.

In contrast to Section 2030, Section 2033(A) is introduced by the phrase "[u]nless otherwise provided in an operating agreement," demonstrating that any or all of Section 2033(A)'s rules concerning assignability of interests may be altered by agreement.

assignable under the Act *unless* the applicable operating agreement precludes or conditions such an assignment.

Pinnacle's operating agreement restricts the assignment of membership interests, and portions and parts thereof, and interests therein, which includes the economic portion of Kramer's interest. The estate took Kramer's interest subject to all terms and conditions of the operating agreement.

**C. Conclusion**

In response to the Limited Remand, the Court advises the Bankruptcy Appellate Panel that the Amended Agreement was not admitted into the record at the Sale Hearing, and that admission of the Amended Agreement would not have changed this Court's conclusion that Trustee cannot sell or assign the estate's economic interest in Pinnacle without complying with the restrictive covenants set forth therein.

Respectfully submitted this 8th day of February, 2022.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT